523 So.2d 266 (1988)
Brian TRACY
v.
The PARISH OF JEFFERSON through its DEPARTMENT OF PUBLIC WORKS, Betty Green and South Carolina Insurance Company.
No. 87-CA-701.
Court of Appeal of Louisiana, Fifth Circuit.
March 14, 1988.
Rehearing Denied April 26, 1988.
*269 Anthony Messina, Parish Atty., Louis G. Gruntz, Jr., Joseph A. Conino, Robert Angelle, Asst. Parish Attys., Gretna, for Parish of Jefferson, defendant-appellant.
Leonard J. Cline and Judy Mackles, Metairie, for plaintiffs-appellees.
Before CHEHARDY, C.J., and KLIEBERT and GOTHARD, JJ.
CHEHARDY, Chief Judge.
This appeal arises from a judgment rendered in favor of plaintiffs, Brian and Judith Tracy, and against defendant, the Parish of Jefferson (the Parish) in a non-jury trial. The suit instituted by plaintiffs sought damages for serious injuries Mr. Tracy allegedly received when he fell after stepping on a parish water meter. Following trial of the matter, plaintiffs were awarded a total of $1,126,319.79. Defendant and plaintiffs appeal the judgment.
In defendant's appeal, the Parish asserts the trial judge erred in finding it strictly liable, in failing to find Brian Tracy comparatively negligent and in allowing the testimony of Von Banting, plaintiffs' expert horticulturist, who was not listed on the pre-trial witness list. The Parish further contends the trial judge erred in assessing damages in the amount of $1,051,319.79 to plaintiff Brian Tracy and in awarding Judith Tracy $75,000 for loss of consortium.
Plaintiffs in their appeal assert the evidence supports an increase in damages for future medical expenses, future psychiatric care, future lost wages and general damages to Mr. Tracy. Further, Mrs. Tracy alleges her award for loss of consortium should be increased to $250,000.
The facts herein reveal that Brian Tracy and his wife Judith attended a music session at a friend's house on the night of February 12, 1984. At approximately 11 p.m. the couple, burdened with music equipment, began walking to Judith Tracy's car parked on the street in front of a neighboring house. Mrs. Tracy was walking behind 31-year-old Brian Tracy. As Mr. Tracy crossed the grassy area between the sidewalk and street to reach the car, he stepped on a Jefferson Parish water meter located near the sidewalk. After stepping on the lid of the water meter, it flipped up and Mr. Tracy's left foot fell into the open hole, plunging him backward. As he fell Mr. Tracy struck his back on the sidewalk and wrenched his neck in an attempt to prevent the fall, producing injuries to his neck, back and shoulder.
*270 Following the accident, and over the course of the lawsuit, Mr. Tracy was treated by two orthopedic surgeons, a general surgeon, a neurosurgeon, and commenced treatment with a psychiatrist. He was hospitalized eight times for a total of 112 days. He underwent several myelograms and discograms and was operated on four times. His neck injury necessitated the removal of three cervical discs and a fusion from C4-C7 using a fibular strut graft. In his lumbar area, L-4 to the sacrum was fused and a luque rod implanted for stability. A bone graft from Mr. Tracy's hip was required for the implant. Further surgeries removed his left breast and torn cartilage from his shoulder. The mastectomy was necessitated due to an enlargement of the breast, which was a side effect of a drug prescribed for him after his back and neck surgery.
Suit was filed on August 14, 1984 against the Parish of Jefferson, Mrs. Betty Green, the landowner, and Harper Foundry and Machine Company, the manufacturer of the water meter. Mrs. Green settled with plaintiffs prior to trial. Harper was dismissed during the course of the bifurcated bench trial held from February 23 to February 26, 1987. On March 5, 1987 a judgment was rendered in plaintiffs' favor in the liability portion of the case against the Parish. On May 14, 1987, after holding the case open for the taking of deposition testimony, the trial court rendered a judgment for damages in plaintiffs' favor as heretofore stated. Subsequently, an amended judgment was rendered on the damage portion to correct an error as to Mrs. Tracy's name.
Defendant first contends the trial court erred in finding it strictly liable for Brian Tracy's injuries in that the water meter in question was not in its custody within the meaning of strict liability. Although defendant admits it owns and maintains the meters, it asserts the property owner is in the better position to recognize and report a hazardous condition. Secondly, the Parish asserts plaintiffs failed to prove a defect within the meaning of strict liability because no evidence was presented to show the "thing" was inherently defective.
In order to recover under strict liability plaintiff must prove that the thing which caused the damage was in the care (or custody) of defendant, the existence of a defect or vice of the thing, and that the damage was caused by this defect or vice. Loescher v. Parr, 324 So.2d 441 (La.1975); Landry v. State, 495 So.2d 1284 (La.1986). Defenses available to the owner or custodian of the defective thing which causes injury are victim fault, fault of a third-party or irresistible force. Loescher, supra.
In regard to the custody question, the evidence established the Parish owns and maintains the water meters placed throughout the Parish of Jefferson. According to the testimony of David Macaluso, director of the Jefferson Parish Water Department, and Darrell Bordelon, supervisor for the Department, the Parish also determines the exact placement of the meters. In addition, the witnesses testified that the water meter workers who regularly read the meters are charged with the duty to report broken meters, meter boxes or other conditions which may be hazardous or which may impede the worker's ability to read meters. Ms. Tina Woodall, who read the meter five weeks prior to the accident and who was responsible for the meter at issue in this case, testified that duty extends to removing debris and grass which may hinder the proper "seating" or fit of the meter cover. The defendant's employees also noted that property owners are prohibited from tampering with the meters by a public ordinance.
Although the Parish does not seriously contend it does not have custody of parish water meters, it seeks to put the responsibility on the adjacent property owner, Mrs. Green. While the property owner may have some liability depending upon their particular actions in causing or failing to report a noticably hazardous condition, the adjacent property owner normally is not responsible for the repair or maintenance of public property. Randall v. Feducia, 499 So.2d 458 (La.App. 2 Cir. 1986), affirmed 507 So.2d 1237 (La.1987). Additionally, knowledge of a defect is not a *271 necessary prerequisite to strict liability. Jones v. City of Baton Rouge, Etc., 388 So.2d 737 (La.1980); Entrevia v. Hood, 427 So.2d 1146 (La.1983). Considering the facts as established by the Parish employees as well as the legal principles of strict liability under LSA-C.C. art. 2317, we find the trial court did not err in holding the meter was in the custody and control of defendant at the time of the accident.
Defendant next contends it cannot be held strictly liable because under strict liability the defect must be inherent in the thing itself. In this case defendant asserts the evidence shows the meter cover which flipped and caused plaintiff to fall was not defective in any manner.
For a thing to be defective within the meaning of strict liability under C.C. art. 2317 it must create an unreasonable risk of harm. Loescher, supra. In determining whether the risk of harm is unreasonable, the court must weigh the magnitude and the probability of injury against the burden of preventing the injury, and in applying the law to the facts of each particular case, the court must consider the moral, social and economic values, as well as the ideal of justice, in reaching an intelligent and responsible decision. Entrevia, supra. Additionally, the mere fact that a thing creates a hazard does not necessarily mean it is defective within the meaning of strict liability. Entrevia, supra; Matt v. Cox, 478 So.2d 918 (La.App. 1 Cir. 1985), writ denied 479 So.2d 913 (La.1985). The key word is "unreasonable" and the plaintiff must show the risk created was unreasonable under all the circumstances. Entrevia, supra; Matt, supra.
In general, the jurisprudence involving injury-causing water meters has held that strict liability is not an available remedy. Those cases cited by defendant, for the most part, were concerned with uncovered meter boxes, the covers for which were missing or totally displaced. See: Matt, supra; Rigao v. Sewerage & Water Bd. of New Orleans, 467 So.2d 1263 (La.App. 4 Cir.1985); Swain v. Sewerage & Water Bd. of New Orleans, 413 So.2d 233 (La.App. 4 Cir.1982). In similar cases, the same decision was reached where the thing causing injury was an open sewer manhole (Goodlow v. City of Alexandria, 407 So.2d 1305 (La.App. 3 Cir.1981)); and an open water valve box (Baker v. Sewerage and Water Bd., 466 So.2d 720 (La.App. 4 Cir.1985)).
In reaching the conclusion that strict liability could not be used to impose liability in those cases, the courts utilized the balancing analysis set forth in Entrevia, supra. In essence, it was determined that although the open meter holes or manholes, as the case may be, constituted "defects", the risk of harm was not considered unreasonable in light of the social and economic factors involved in preventing the injury.
The opposite result was obtained by the plaintiffs in Jones v. City of Baton Rouge, Etc., supra; Jones v. Sewerage & Water Bd. of New Orleans, 430 So.2d 1063 (La. App. 4 Cir.1983); and Deville v. Calcasieu Gravity, Etc., 422 So.2d 631 (La. App. 3 Cir.1982). In Jones v. City of Baton Rouge, Etc., supra, the offending object was a cover of a catch-basin which collapsed under plaintiff's weight despite its proper fit. There the cover was deemed inherently defective. A similar fact situation was before the court in Deville, supra, and the same judicial holding resulted. The Jones v. Sewerage & Water Bd. of New Orleans, supra, case involved an open drain clean-out hole which was abandoned by the city. In that case the open hole was found to have created an unreasonable risk of harm since the utility of the thing was nonexistent.
In this case the evidence showed the meter cover and box were manufactured according to defendant's specifications. In addition, the meter involved in this accident was produced at trial where it was demonstrated that the lid is designed to sustain the weight of a person and that it did so when the cover was properly seated. Further evidence showed that the cover was designed with a walking surface, and that the design of the meter box and cover was geared in part to the expectation that people would walk on them. Thus, the evidence failed to show the meter lid in question was in any way inherently defective. *272 The remaining question then is whether other factors surrounding the accident and the meter box constituted an unreasonable risk of harm.
The testimony of the Parish employees, Bordelon and Macaluso; plaintiffs' horticulture expert, Von Banting; and plaintiffs' safety experts, Donald Godlewski and George Pappas, established that growing grass, roots or debris located between the lid and container would more than likely cause an impairment of the lid's fit. As testified by plaintiffs' experts, an impairment of the meter cover's fit would, in turn, likely cause the lid to flip or tilt when stepped on since its ability to handle the weight of a person was dependent on its proper seating. Even the defendant and the manufacturer, through the testimony of Sidney Harper, agreed that grass and debris would impair the fit of the cover, and that only an unimpaired seating could be safely walked upon.
In order to secure a proper fit, Macaluso and Bordelon testified the meter readers were instructed to remove grass and debris which would impair the seating and to "stomp" on the cover after replacing the lid. Woodall stated in practice, however, they did not routinely remove grass as long as the lid felt secure.
Plaintiffs' experts examined photographs taken shortly after the accident and Pappas in fact examined the site on February 24, 1984. He and Banting agreed the water meter at issue contained leaves and grass and Pappas further testified that he saw blades of grass growing in the meter box as long as 15 inches. Godlewski, plaintiffs' expert on human safety factors, further noted the meter was set in the ground below the grade of the surrounding grassy surface. He and Banting, as well as defendant's employee Macaluso, agreed a "below grade" meter box would contribute to the likelihood that grass, weeds, and/or debris would find a way into the meter housing. As Banting explained, trapped grass will convert itself to a root system since the grass, deprived of sunlight, will exploit whatever moisture is available in the contained area. As a result, heavy thatching and rooting will occur. In his opinion the grass that was shown in the photographs to have been in the meter box shortly after the accident had to have been growing since the previous growth season, the summer of 1983. His opinion was shared by Pappas, and all of the plaintiffs' experts believed the accident was caused by the improper seating of the cover which was in turn caused by grass growing between the lid and housing.
Defendant's safety expert, Michael Cannon, disagreed with this opinion. He stated his experimentation showed the cover would not be displaced easily even with some grass caught between the lid and housing. He also testified, however, that at some point the grass would affect the cover's fit.
The defendant produced another expert in this regard whose testimony was taken by deposition following the trial along with two medical witnesses. The case was left open for this purpose. However, those depositions are not in the record and our investigation disclosed that they were never officially filed into the record. Although the trial judge apparently had the depositions available and considered the testimony before he rendered his decision, we are not empowered to consider such testimony.
A trial court's factual findings are given great weight on appellate review and may not be modified absent a finding of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). In this case the trial judge found that the accident was caused by a "defect" in that the meter's lid was not seated properly due to grass growth between the lid and meter box. We find no manifest error in these factual findings. However, we do not agree that the risk created by this "defect" is unreasonable for strict liability purposes after weighing the social, economic and moral factors against the magnitude of the risk. Like the courts in Matt and Rigao, we recognize the defect, in this case an improperly sealed lid, is a hazard to those exposed to it. Yet that risk is greatly outweighed by the importance of providing water to the hundreds of parish residents *273 and collecting the necessary fees for its use. Were we to find liability without fault under these facts, we would be placing a too costly and unwieldy burden on the defendant to prevent the risk of harm. Consequently, we find the trial judge erred in finding a defect within the meaning of strict liability.
Although we find strict liability inapplicable in this case, our review of defendant's liability does not end with that determination. As found in Swain, supra, the municipality may alternatively be found negligent if the facts support such a finding. In that regard plaintiffs contend that the facts show defendant's conduct was (1) a cause in fact of the harm, (2) that defendant owed a legal duty to plaintiff which encompassed the particular risk of harm to which Mr. Tracy was exposed, (3) that defendant breached its duty to Mr. Tracy, and (4) that plaintiff was damaged by defendant's breach of duty. Stadler v. Agard, 503 So.2d 112 (La.App. 5 Cir.1987). And, as in any other negligence action under LSA-C.C. art. 2315, in order to find a municipality negligent, it must be shown that it had actual or constructive knowledge of the risk of harm. Swain, supra; Matt, supra; Rigao, supra.
We have already determined the record does not reveal manifest error in regard to the trial judge's finding that the accident was caused by the improper seating of the lid which, in turn, was due to the accumulation of grass and debris between the lid and the meter box. The evidence also shows more likely than not that this condition existed as early as 1983; that the meter reader checked the meter five weeks prior to the accident and that the meter reader is charged with the duty to insure the proper fit of each meter cover. In addition, the testimony revealed the meter was "below grade", a condition which may only occur over a long period of time and which should have been noticed and reported by the Parish's employee. Thus, the facts show defendant had a duty to correct the condition and that it had actual or constructive knowledge of the defective condition of the meter. Since no measures were taken to eliminate or correct the defect, we further find defendant breached its duty to Mr. Tracy and that the breach caused the accident. Consequently, we find defendant is liable to plaintiffs for its negligence.
In defendant's next specification of error it contends the trial court erred in failing to find comparative negligence on the part of Mr. Tracy. Defendant asserts Mr. Tracy should have been aware of the danger since eight or nine months before this accident the identical meter caused him to fall.
In this regard, the law does not require a person "to exercise the utmost caution at each moment to avoid every hazard of which he was ever aware." Soileau v. South Cent. Bell Tel. Co., 406 So.2d 182, 184 (La.1981). It allows the reasonable man occasional lapses of memory. Soileau, supra; Deville, supra. The question is whether the lapse was reasonable and whether he was exercising ordinary care for his own safety. Soileau, supra; Deville, supra.
In this case, Mr. Tracy stated he was returning from Paledino's house to his car some months before this accident, when he stepped on the water meter and it "gave out". He stated it was daylight at the time and he was not injured in that fall. When the second accident occurred, Mr. Tracy testified, it was dark, and he was carrying musical equipment to his car. Although he was carrying equipment, he indicated he was watching where he was going in a normal fashion.
The trial judge concluded that Mr. Tracy was exercising reasonable care for his own safety on the night of the accident. He also found that Mr. Tracy had not committed the location of the meter to memory. Considering the trial judge's findings and the elapsed time between incidents, we cannot say the trial judge was manifestly erroneous in finding Mr. Tracy free from negligence.
The defendant's third specification of error questions the trial judge's ruling which allowed Banting, plaintiff's expert in horticulture, to testify as a rebuttal witness. *274 Defendant contends the trial judge erred in allowing the testimony because he was not listed on the pre-trial order, and because he was not in fact a rebuttal witness since his testimony was taken during plaintiffs' case-in-chief.
Plaintiffs argue the testimony was properly allowed because Banting was a rebuttal witness whose testimony was taken out of order for the witness' convenience. Plaintiffs point out further that the trial judge deferred ruling on the objection until defendant completed its case and that under these circumstances the trial judge did not abuse his discretion.
The trial judge has discretion in conducting a trial. He is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. art. 1631. His discretion includes the order of presentation of witnesses, LSA-C.C.P. art. 1632, as well as the admissibility of a witness' testimony whether that witness is brought in rebuttal or one that was not listed on the pre-trial order. LSA-C.C.P. art. 1551; see: O'Bannon v. Azar, 435 So.2d 1144 (La.App. 4 Cir.1983); Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5 Cir.1983). Further, rebuttal witnesses are not required to be listed on the pre-trial order. Brown v. Hawkins, 244 So.2d 896 (La.App. 1 Cir.1971), writ denied 258 La. 572, 247 So.2d 393 (1971).
In this case the witness was called as a rebuttal witness. The trial judge stated he allowed the witness to testify out of order because it was a non-jury trial and as a matter of convenience to the witness. He then deferred ruling on the objection until after the close of the parties' evidence. He pointed out that as the judge, he was well able to decide the case regardless of his ruling, unlike in a jury case in which the testimony may have prejudicial effect. We find under the circumstances the trial judge did not abuse his discretion in admitting the testimony.
In its fourth specification of error, defendant contends the damages awarded to Mr. Tracy are excessive. In his cross-appeal, Mr. Tracy argues the amount should be increased.
An award of damages by the trier of fact may not be disturbed unless the appellate court finds an abuse of discretion after an articulated analysis of the facts. Reck v. Stevens, 373 So.2d 498 (La.1979). If an abuse of discretion is found after such an analysis, then the court may resort to prior awards in comparable cases for guidance in fixing the appropriate award. Reck, supra; Capone v. King, 467 So.2d 574 (La.App. 5 Cir.1985), writ denied 468 So.2d 1203 (La.1985). Even then, the award may only be lowered (or raised) to the highest (or lowest) point which is reasonably within the trial court's discretion. Coco v. Winston Industries, Inc., 341 So. 2d 332 (La.1976); Emerson v. Empire Fire & Marine Ins. Co., 393 So.2d 691 (La.1981).
The trial court awarded Mr. Tracy $1,051,319.79, divided as follows:

Past Medical Expenses $ 82,801.79
Future Medical Expenses 29,000.00
Future Psychiatric Expenses 20,800.00
Lost WagesPast 33,421.00
Lost WagesFuture 285,297.00
Physical Pain and Suffering 350,000.00
Mental Anguish 250,000.00

Defendant does not seriously dispute the award for past medical expenses and those were fully documented at trial. However, defendant does complain about the expenses related to Mr. Tracy's mastectomy.
In this regard the record shows Mr. Tracy had prior problems with stomach ulcers. It further shows the drug Tagamet, an ulcer medication, was prescribed to him following his neck and back surgeries in May 1985 by Dr. Bruce Razza, his treating physician and orthopedic surgeon. Dr. Razza testified it is general practice to prescribe Tagamet after surgery if the patient has had prior stomach problems. Tagamet, however, it was shown, has a rare side-effect which causes male breast enlargement. The condition is not reversible except by surgical removal of the tissue. Because the surgery and its attendant medications were necessitated by the injury sustained in Mr. Tracy's fall, we find the *275 expenses related to the mastectomy attributable to defendant.
As to Mr. Tracy's future medicals, Dr. Razza testified that Mr. Tracy's lumbar fusion was not completely successful, which means the source of pain is still present. He stated a new surgical procedure is now available which would provide a better chance to stabilize Mr. Tracy's spine. He believed the new surgical procedure, which utilizes an A.O. plate, would not eliminate Mr. Tracy's pain, but that it would give him significant relief. The cost of that procedure, he stated, would range from $5,000 to $10,000 for the surgery, and $10,000 to $15,000 for the hospital. When asked whether further surgery is probable, the doctor stated Mr. Tracy has to make the decision, but the surgery has a good chance of helping him if he decides he cannot deal with the pain. In response to questioning on this issue, Mr. Tracy testified his pain has never gone away and that if the pain continues to worsen, he will have to have some type of corrective surgery.
After reviewing the evidence on this issue, the trial judge concluded it was more likely than not that Mr. Tracy will require future surgery. After our review, we find the trial judge did not abuse his discretion in this matter.
The court also awarded Mr. Tracy future psychiatric expenses based on the testimony of Dr. Millard Jenson. Dr. Jensen is a board-certified psychiatrist with a subspecialty in neurology. His testimony described in great detail the cause and reasons for the onset of Mr. Tracy's psychiatric difficulties.
On his first visit, Dr. Jensen diagnosed the plaintiff as suffering from traumatic-type anxiety reaction with symptoms of paranoia. Although he stated Mr. Tracy has a compulsive-obsessive personality and had some emotional problems early in life, he noted Mr. Tracy had no prior history of psychiatric difficulties as evidenced by his working three jobs, his interests and activities, and his relationships. The accident and injury, however, he explained, precipitated a deterioration of Mr. Tracy's carefully built defense systems which manifested as high anxiety, personality changes, agitation and poor impulsive control "all the way to rage reactions." Dr. Jensen stated the physical pain Mr. Tracy experiences, along with the concurrent loss of mobility, eroded his coping capabilities and induced the paranoid element, which is a pathological defense to the situation. Because the symptoms began manifesting shortly after the accident, surgery to correct the neck, back and shoulder problems was considered not advisable until over a year after the accident. In the meantime he began treatment with Dr. Jensen, who treated him with the view toward a potential psychotic break and hospitalized him on two occasions (December 1984 and January 1985). Dr. Jensen further testified Mr. Tracy's marital life was, and is, severely affected by his mental condition. He said that Mr. Tracy's pain and limited mobility, along with his irritability and anxiety has caused the relationship between the couple to deteriorate and that Mr. Tracy has difficulty in engaging in sexual intercourse.
Dr. Jensen concluded that Mr. Tracy's mental illness will require at least two more years of intense therapy with periods of hospitalization. But because he may potentially achieve a complete breakdown, he may also be in and out of psychiatric hospitals the rest of his life. Dr. Jensen also stated Mr. Tracy's prognosis is not good, although rehabilitation should be attempted.
The trial judge awarded Mr. Tracy $20,800 for future psychiatric expenses. After our review we cannot say the trial court abused his discretion in the award.
The next item of damages at issue is the award for lost wages. Defendant contends the award is excessive because it is based on the assumption Mr. Tracy is permanently unemployable. Defendant suggests the economic expert's calculation of part-time employment at minimum wage is a more appropriate award based on the evidence.
Mr. Tracy, who was 31 years old at the time of the accident, worked as a teller at Whitney National Bank prior to the accident. *276 He had completed two semesters of college with vague plans to pursue an engineering degree. Mr. Tracy also worked in his mother's restaurant performing menial jobs in exchange for free room and board in an apartment above the restaurant. In addition, Mr. Tracy was attempting to keep his deceased father's business operating, although it was operating at a loss. All total he was working several hours a day, seven days a week in the family businesses and 40 hours a week at the bank. Following his injuries, he was discharged from his position at the bank, and could no longer perform his duties in the family businesses.
Dr. Melvin Wolfson, an economic expert, calculated his lost past and future wages solely on Mr. Tracy's $10,000 salary at the bank. He first calculated the wages based on the assumption that Mr. Tracy would be permanently unemployable. Using a work-life expectency of 28 years, he calculated Mr. Tracy lost $30,383 to $33,421 in wages up to the date of trial. The latter figure was based on salary plus benefits. Using those same figures he projected Mr. Tracy's future loss as $285,297, considering annual increases for the average teller over the past 30 years, and using a discount rate of 7.5% to obtain a present value. He also added 10%, which represented fringe benefits.
Asked to assume Mr. Tracy's future employment at minimum wage ($3.35 per hour) on a part-time basis (20 hours per week), his figures yielded a total of $210,090, including fringe benefits. Without benefits, the loss was calculated to be $184,153.
The trial judge rendered his award based on the probability that Mr. Tracy is permanently unemployable. Dr. Razza and a rehabilitation expert, Judith Lide Meyers, agreed that Mr. Tracy was presently unemployable. In addition, Dr. Jensen and Dr. Razza believed it was unlikely he would become employable due to his physical and mental handicaps. Notably, Dr. Razza gave him a 55-60% permanent total physical disability. From a rehabilitative viewpoint, Ms. Meyers stated that even if his physical condition improves, his placement in the job market would be difficult because of his varied problems. Although she would be willing to make the attempt, she thought it unlikely Mr. Tracy can be successfully rehabilitated.
Defendant contends this evidence does not prove Mr. Tracy will not be employable in the future, however, the trial judge found otherwise, and we find no manifest error in this determination. Mr. Tracy, on the other hand, asserts consideration should have been given to his plans to become an engineer. The trial court apparently believed this goal was improbable, especially in light of Ms. Meyer's testimony that he tested low on mathematics and reading tests. Again, we find no manifest error in the trial judge's conclusion.
The final issue related to Mr. Tracy's damages involves the award for pain and suffering. Defendant contends Mr. Tracy's award is excessive because he has a tendency to exaggerate, because he refused medications and surgery when he was initially treated shortly after the accident, and because he waited three days before going to see a doctor after the accident. Mr. Tracy asserts the evidence justifies an increase for pain and suffering.
The evidence of Mr. Tracy's injuries shows he sustained real and painful injuries. His subjective assertions of pain were supported by numerous objective tests (myelograms, discograms, hands-on examination) performed during several hospitalizations by three different physicians: Dr. Harold Stokes, an orthopedic surgeon who treated him initially, as well as for a resolved back surgery in 1983; Dr. Roselyn Meanoi, a neurosurgeon; and Dr. Razza. The testimony also shows Mr. Tracy was reluctant to undergo surgery and take medications at first because he hoped the pain would resolve itself without medical intervention. When Dr. Stokes finally recommended surgery during his first hospitalization, Mr. Tracy's mental condition had become apparent and surgery was cancelled. He was then referred to Dr. Jensen, who began the treatment for the emotional symptoms which continue to date. As pointed out in our statement of facts, he *277 furthermore underwent numerous medical procedures, endured painful diagnostic tests, suffered through four surgeries, and as yet his medical problems have not been resolved. At time of trial he was still experiencing severe discomfort because of the unsuccessful lumbar fusion.
Mr. Tracy testified as to the onset of his physical symptoms. He stated that when he fell he experienced a "very, very terrible immense pain as a feeling of someone pouring hot hot liquid down my back onto my legs." He further said he felt as though he snapped something in his neck and that he felt pain radiating into his shoulders and left arm.
Mr. Tracy's complaints were further supported by the testimony of his wife and mother. In particular his mother noted he spent several weeks at her house following the back and neck surgery because he was unable to care for himself. Due to his inability to climb stairs or move without discomfort he and his wife had to move out of their rent-free upstairs apartment. In addition, his wife testified their marriage has developed problems and the pain has prevented him from engaging in sexual relations.
In regard to his previous lifestyle, Mr. Tracy no longer indulges in his musical pursuits because playing instruments causes neck and back discomfort. The witnesses stated he is unable to participate in football, baseball, exercise, boating or fishing. Further, he cannot perform household chores, work in any salaried employment, or assist in the family businesses.
The evidence as a whole shows Mr. Tracy has a 55-60% permanent total physical disability, is unemployable and will continue to suffer pain from his injuries. It further reveals his lifestyle has been severely changed, his mental state is in a shambles, and his marriage has become chaotic. Although Dr. Jensen testified his paranoia would tend to produce some exaggeration, Dr. Jensen and the other physicians are firmly convinced Mr. Tracy was suffering and will continue to suffer severe pain. Considering this evidence, we find no abuse of the trial court's award for pain and suffering.
The final question presented for our review involves the award to Mrs. Tracy for loss of consortium. Before we dispose of this issue we must address a problem we have discovered in the judgment.
Because the issues of liability and damages were bifurcated, the trial judge issued a separate judgment as to damages. That judgment dated May 14, 1987 was amended by a subsequent judgment based on plaintiffs' motion to amend due to an error in Mrs. Tracy's name. In the original judgment Mrs. Tracy was referred to as Delores instead of Judith, her correct name. Such an amendment is of questionable validity. See: LSA-C.C. art. 1951. However, since the parties appealed from the May 14, 1987 judgment, it is within our authority to correct this obvious mistake, and our decree will amend the judgment to reflect the correction.
Returning to the final issue, loss of consortium includes such elements as loss of service, loss of love and affection, loss of society and companionship, loss of sexual relations, loss of support, and loss of felicity or overall contentment and happiness. Finley v. Bass, 478 So.2d 608 (La. App. 2 Cir.1985).
In this case, it was apparent to the trial judge that Mrs. Tracy was entitled to a substantial loss of consortium award. Her normal two-year-old marriage deteriorated to a point that she testified she sought counsel from her husband's psychiatrist. The testimony showed they no longer share activities such as music, sports or boating. She has further been deprived of a sexual partner, her hopes for children have faded and the love and affection between the couple have been severely strained. In addition, the services a husband normally provides has been lost, including Mr. Tracy's ability to provide financial assistance. Because of his disabilities, the losses Mrs. Tracy has suffered in the past may well continue into the future. Based on our review of the evidence in this case, we do not find the trial court erred in its award to Mrs. Tracy for loss of consortium.
Accordingly, we hereby amend the judgment of May 14, 1987 to delete the name *278 Delores Tracy who is designated as plaintiff in the trial court judgment of May 14, 1987 wherever it may be found and replace the name with Judith Tracy as plaintiff wherever such replacement is warranted. In all other respects, the judgments of March 5, 1987 and May 14, 1987 are hereby affirmed. All costs of this appeal are to be paid by appellant.
AMENDED AND, AS AMENDED, AFFIRMED.

ON APPLICATION FOR REHEARING
Subsequent to rendition of our opinion in this case, defendant filed a motion for rehearing to reconsider the evidence adduced at trial. While the motion for rehearing was pending, defendant filed a motion to supplement the record with deposition we declined to consider due to the absence of the documents in the record, and of any proof they had been properly introduced into evidence. We granted defendant's motion to supplement the record after issuing a show cause order to plaintiffs.
After reviewing the deposition testimony as well as defendant's arguments in his motion for rehearing, we find no reason to rehear the case or to modify our decision.
Accordingly, defendant's motion for rehearing is hereby denied.
REHEARING DENIED.