672 So.2d 951 (1996)
Lee LeBLANC
v.
CONTINENTAL GRAIN COMPANY, INC. and the Port Commission of South Louisiana.
No. 95-CA-813.
Court of Appeal of Louisiana, Fifth Circuit.
March 13, 1996.
Rehearing Denied May 17, 1996.
*953 Victor L. Marcello, Talbot, Carmouche, Marchand & Marcello, Gonzales, for Plaintiff/Appellee, Lee LeBlanc.
James H. Daigle, Kenneth M. Klemm, Lemle & Kelleher, New Orleans, for Defendant/Appellant, Continental Reserve Elevator Corporation.
Sidney W. Degan, III, Foster P. Nash, III, Patricia M. Crowley, Degan, Blanchard & Nash, New Orleans, for Defendants/Appellees, Louis Dreyfus Corporation and National Union Fire Insurance Company of Pittsburgh, Pa.
Before BOWES, GRISBAUM and WICKER, JJ.
BOWES, Judge.
Defendant, Continental Reserve Elevator Corporation (originally named and sued simply as "Continental Grain Company"), appeals a judgment in favor of plaintiff, Lee LeBlanc, for injuries received in an industrial accident. For the reasons to follow hereinafter, we amend the judgment in part and, as amended, affirm.
At the outset, it is necessary to explain the relationship of the various parties to the proceedings. The South Louisiana Port Commission ("Port Commission") leased the subject grain facility to Bayside Warehouse Company a/k/a Cook Industries, Inc. ("Bayside"), a company not a party to these proceedings; in 1978, Mitsui and Company (U.S.A.) ("Mitsui") purchased the lease, and subsequently formed La Place Elevator Company ("La Place") to assume the lease from the Port Commission. La Place thereafter entered into a sublease agreement with Continental Reserve Elevator Corporation ("Continental") in 1978, which terminated in 1984, allowing the facility to revert to La Place. Mitsui formed a second subsidiary, Reserve Elevator Corporation ("Reserve") to operate and manage the facility until 1987, at which time the Louis Dreyfus Corporation ("Dreyfus") assumed the lease of the grain facility. Thus, in 1991, Dreyfus was the lessee.
On November 18, 1991, plaintiff was employed by Dreyfus at the dock on the Mississippi River where the grain facility was located, and was instructed to grease a chain on a Carter-Day Dust System while the system was operating. While plaintiff was in the process of so doing, a vessel struck the dock, shaking it and causing plaintiff to lose balance, fall forward and catch his right hand in the chain and sprocket. As a result, plaintiff's fingers were partially amputated and his hand was injured.
Plaintiff initially filed suit against Continental and the Port Commission. In the petition, LeBlanc alleged that the Port Commission was liable as the owner of the property, and that Continental, the former sublessee of La Place, was negligent because during its occupancy of the premises, it had:
1. altered the safety system on the dock at the time it had custody of the facility;
2. destroyed a guarding system;
3. failed to properly repair the guard; and
4. failed to post proper warnings after it had destroyed the guarding system.
Numerous third party complaints and cross claims were filed by each of the parties, and all such complaints and claims were subsequently dismissed by joint motion. Plaintiff amended his original petition to include Mitsui and Dreyfus as direct defendants, and to substitute Continental Reserve for Continental Grain.
*954 Dreyfus filed a petition of intervention, seeking indemnity for compensation benefits paid.
Prior to trial, plaintiff settled his claims against the Port Commission, Dreyfus, Mitsui, La Place Elevator and Reserve Elevator Corporation. The third party complaints and cross-claims were dismissed, so that by the time the jury trial commenced, the only remaining defendant was Continental Reserve Elevator Corp. with Dreyfus participating as intervenor on its worker's compensation claim. After the trial concluded, the jury rendered its verdict finding Continental liable in negligence, and apportioned fault as follows:

Lee LeBlanc-------------------------6%
Continental------------------------51%
Port Commission---------------------7%
Mitsui/Reserve/La Place-------------7%
Dreyfus----------------------------29%
 ______
Total-----------------------------100%

The jury awarded general damages in the amount of $183,000.00; in addition, the parties had stipulated to past wage loss of $9,810.00, as well as to medical expenses of $16,664.77. The judgment ultimately entered, therefore, totaled $209,474.77. In accordance with Gauthier v. O'Brien, 618 So.2d 825 (La.1993), infra, the trial judge apportioned liability thusly:

LeBlanc-----------------------------8.4%
Continental------------------------71.8%
Port Commission---------------------9.8%
Mitsui/Reserve/La Place-------------9.8%
Dreyfus-------------------------------0%

Judgment was rendered in favor of plaintiff and against Continental for 71.8% of the total principal judgment, or $150,402.88, with legal interest; Dreyfus and National Union recovered $62,922.70 on their intervention, plus interest. The judgment dismissed the plaintiff's claims for future lost wages or earning capacity, and the loss of consortium claims of Mrs. LeBlanc were also dismissed. It is from this judgment that Continental has appealed.

EVIDENCE AND TESTIMONY
Joseph LeBlanc (no relation to plaintiff) testified at trial that he was taught how to maintain and operate the dust systems by Mr. Gene Becnel, and was shown how to grease the chains in the systems by Henry Stein. The chains had to be kept lubricated at least once a week in order to prevent them from becoming worn out. There was a hole of about three by four (inches) cut in the chain guards, patched with another, slightly larger piece of metal creating a flap on the guard.
Stein told LeBlanc that Bernard Adams of Continental had cut the holes so that grease could be pumped in the chains. The flap would be turned up and the chain greased with a grease gun as it was running. Ordinarily, when a machine was to be worked on, he was to put a lock on the machine switch, turn the power off and pull the fuses, tagging the machine for repair. However, this lock and tag procedure was not to be carried out when the chains on the locks were greased, because the elevator would have to be shut down too long.
LeBlanc thought that the way the company wanted them to grease the chains (i.e., to stick something like a grease gun inside a piece of moving equipment) was unsafe. If there had been no hole in the guard, a finger could not have been caught in it. All the dust systems had similar holes, and, subsequent to the accident, the holes were repaired. LeBlanc helped to train plaintiff to work on and maintain the dust systems.
Henry Stein was a maintenance supervisor at the Reserve Grain Elevator. (Plaintiff is the son-in-law of his wife). Stein had been employed at the elevator during the occupancy of Continental in 1980 or 1981, so Stein knew that Bernard Adams had cut the holes in each of the chain guards (presumably in order to make it easier to grease the chains). Only twice in twenty-five years had the Port Commission inspected the facilities, and an inspector would not have noticed the holes with the flaps down unless he was looking for it.
Stein filled out the accident report, which states that plaintiff had put his hand inside the guard, and which did not mention that the barge hit the dock. The report further included the information that the chain should be sprayed from outside the chain guard. Stein was positive that there was no *955 flap on the chain guard on which plaintiff was injured, and plaintiff's was the only injury involving those holes to Stein's knowledge.
Prior to the accident, Stein did not think that it was necessary to patch those holes. The system was always left running when the chains were greased because, otherwise, you had to shut down whatever the system maintained which would spread dust all over the place.
Plaintiff testified that the chains had to be greased weekly, and that he had done so many times, without incident, the same way he did on the day of the accident. On that day, he was kneeling in front of the lock with the hose for the grease gun in one hand, and the gun itself on his left knee. There was a flap over the hole. He was pumping the grease when a barge hit the dock, causing him to fall forward into the chain, his right hand going into the hole.
Plaintiff further testified that there were no discussions at safety meetings on how to safely grease the chain involved in the accident. He was never told that he should use spray cans instead of a grease gun on the chains and he had not felt that the chain guards were unsafe.
After the accident he was taken to the hospital where the amputated fingers were stitched. He spent the night in the hospital, and was sent home the next day. Later, he almost fainted when the doctor tried to take out the stitches; after twice failing to remove the stitches without great pain to plaintiff, LeBlanc was referred to Dr. Hal Stokes, who successfully removed the stitches and began treatment and physical therapy.
At the end of January plaintiff returned to light duty work. At that time, he was missing the middle finger and the first joint of his index finger of his right hand. He had trouble climbing and gripping, and there was a lot of swelling and pain. Cold weather caused, and still causes, numbness and a feeling of pressure. He continued in the same job as a dust system mechanic until October of 1993. Two years after the accident he was having stiffness and other problems in the knuckle of his partially amputated finger, and Dr. Stokes eventually removed the joint on the index finger.
At the time of the accident, plaintiff was making $10.35 per hour and at the time of trial was earning $14.23 per hour. He became classified later as a millwright and then as an electrician. He has to be more cautious and still has trouble climbing and gripping. When it is cold outside his hand easily becomes numb. Outside of his job, plaintiff has not been able to continue with carpentry work at home and he has problems buttoning his clothes. However, he has no problems in his relationship with his wife, and only occasionally takes Tylenol for pain.
The video deposition of Dr. Harold Stokes was admitted into evidence. Dr. Stokes described the therapy which plaintiff had to undergo, and described plaintiff's many complaints of swelling, tenderness, and discomfort over a period of about seventeen months. Because it got in his way, plaintiff decided to undergo amputation of the joint on his (useless) index finger. Upon reaching maximum medical improvement in April of 1993, plaintiff had a 50% anatomical impairment of one finger and an 85% impairment of the index finger, as computed by Dr. Stokes. Plaintiff also suffered a loss of dexterity, and would continue to have a weak grip and loss of fine coordination.
Neil Logan, a consulting civil engineer, testified that one of his duties was to inspect the grain elevator at Reserve. These inspections were done every two years. Inspection reports dated 1982, 1984, 1986, 1988, and 1991, were admitted into evidence. The dust collection system had been duly inspected and, in 1984 and the report found that Continental's on-going maintenance program appeared to keep the facility in excellent operating condition. However, these were general inspections, not exhaustive.
Bernard Adams, who retired from Continental in 1985, testified that his job was to check and clean the dust systems. To grease or oil the lock chains he used a spray can through the screens; there were no holes in the screen to be lifted up, and he never cut holes in the chain guards in order to grease them. Sometimes when he was cleaning he would have to take the chain guard off, but *956 would always cut the system off first. He did not know who cut the holes or when they were cut. He did not remember even if there were holes while he was employed at Continental.
Terry LeBoeuf testified as a former employee, an oiler, of Continental Reserve. His job was to grease the gear box, next to the chains, at the facility. He saw no holes in the chain guards while he worked there, and if there had been, he would have seen it because he worked within one foot of the guards.
Donald Vicknair, formerly the assistant maintenance superintendent at Continental through 1986, remembered that Bernard Adams used to grease the chains by spraying through the guards. Vicknair had to inspect the equipment including the chain guards, and he saw no holes in those guards while he was employed at Continental. He stated on cross-examination that the chain guard was seven or eight feet above his head, and he did not climb up to inspect it.
Gene Street formerly worked for Continental as the "safety man." His job was to inspect the plant and take care of safety, training the employees. He drew up a schedule on cleaning the dust systems, and it was Bernard Adams' duty to grease the chains. Adams sprayed the chains through the mesh screens. Street further testified that there were no holes in the chain guards while he worked there, which was the entire time Continental had the facility.
Forest Gene Hill testified he began working at the Reserve facility in 1987 as plant superintendent and safety coordinator. According to his testimony, the dust system collector took dust off of the barge unloading legs as the barges were unloaded; the systems did not operate 24 hours a day and did not run in between unloading barges. Between barges, the systems could be locked out and tagged and serviced. However, shutting down the system immediately would cause dust to fall to the bottom and necessitate someone having to clean up the system, which would not be necessary if you leave the air system running before you shut it down. This lock out and tag procedure was discussed at safety meetings at which plaintiff was present.
After the accident, Hill looked at the chain guard and did see the hole and flap. During the whole time he was there he never saw holes in any of the chain guards and had not gone up and inspected the chain guards. After the accident, he ordered that the holes be welded shut, but from ground level they looked the same as they did before. He did not know whether or not it had been a long standing practice to grease the chains through those holes.
Robert Becnel testified on rebuttal as a former employee of Continental. He was a millwright who fixed the equipment, and he testified that while he worked at Continental, the dust system was installed (in 1978 or 1979) and that holes were cut in the chain guard. As of 1991, he saw the employees pick up the flap and spray the chain with an aerosol can, although they occasionally used a grease gun.
Plaintiff testified on rebuttal that when the system is shut down, purging is necessary to clean the dust, and each cycle may take 10 minutes to one hour. He was not instructed to shut down the system to lubricate it; His superior, or boss, at Dreyfus would tell him not to stop the system to grease it. He would lock out and tag the system only if he had to repair something in it.

ISSUES
Defendant raises several issues on the appropriate theories of liability, suggesting reasons why it is not liable under any theory of strict liability or negligence. Because of our determination that a trial de novo by this Court on the issue of liability is required, we find it unnecessary now to address each issue raised.

ANALYSIS
At the time of trial, Gauthier v. O'Brien, 618 So.2d 825 (La.1993) permitted the "quantification" of employer fault in cases such as the one before us. In Gauthier, the court permitted the jury to apportion fault to the negligent employer; however, the trial judge was then obliged to "disregard the *957 proportion of fault assessed to the employer and reallot the proportional fault of all other blameworthy parties." 618 So.2d at 833. Importantly, however, shortly thereafter, the Supreme Court handed down its opinion in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95), 657 So.2d 975 in which it overruled Gauthier, declaring as follows at 982-983:
We conclude that while quantification of the fault of a non-party settling tortfeasor is entirely appropriate and was probably contemplated by La.Code Civ.Proc. art. 1812C, quantification of the fault of an employer is not necessary or appropriate under Article 1812C in an action against a third party tortfeasor ...
We reconsider and reject the holding in Gauthier relative to mandatory quantification of employer fault. Neither the pre-1987 nor the post-1987 version of Article 2324B requires the quantification of employer fault.[1] [Emphasis supplied].
We interpret the above language in italic letters to mean that, by specifically reconsidering and rejecting their own previous decision in Gauthier, the Supreme Court meant that quantification of employer fault was improper not only post-Cavalier, but has, in fact, always been inappropriate. Article 2324 has not been changed between the Gauthier and Cavalier cases; rather, what has changed is the judicial interpretation of that law. Therefore, despite Gauthier, and because of Cavalier, it was error to assess fault against Dreyfus in the instant case. Consequently, the jury was erroneously instructed in the case sub judice to quantify the fault of Dreyfus, the employer, and this error obviously contributed to the verdict.
For these reasons, under our constitutional authority to review facts, we must make an independent determination of the facts from the record without according weight to the factual findings of the jury. See Picou v. Ferrara, 483 So.2d 915 (La. 1986). Accordingly, when the court of appeal finds that a reversible error of law was made in the trial court, it is required to redetermine the facts de novo from the entire record and render judgment on the merits. Rosell v. ESCO, 549 So.2d 840 (La.1989), citing Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). Also Anders v. Boudion, 93-894 (La.App. 5 Cir. 3/29/94), 636 So.2d 1029.
Appellant, Continental, avers that the employer, Dreyfus, is liable under a contractual assumption of liability for the leased premises. In our examination of the Cavalier opinion, we do not find or discern an intent to distinguish an employer who may have contractually assumed liability. The court in Cavalier reasoned thusly:
While employers cannot be joined as defendants or third party defendants, there is no compelling reason (as there is in the case of released tortfeasors) that makes it necessary or appropriate to require quantification of employer fault. Moreover, employers not only are immune from liability in the third party action by virtue of the compensation bargain, but also are granted a lien on the employee's recovery against third parties. If employer fault were quantified, the tort victim not only would suffer a reduction in the percentage *958 of tortfeasor fault available for recovery, but also would suffer an additional reduction because of the priority of the at-fault employer's statutory lien on the recovery proceeds which now are reduced from one hundred percent to fifty percent from any one of multiple tortfeasors. [Emphasis supplied].
657 So.2d at 982.
In these words, and in such logic, we find no reason to differentiate an employer who may have contractually assumed liability. We find that Stelly v. Overhead Door Co. of Baton Rouge, 94-569 (La. 12/8/94), 646 So.2d 905, relied upon by defendant, was determined prior to Cavalier, supra, and the injury in Stelly occurred prior to the amendment of La.R.S. 23:1032, which specifically disallows any claims by an employee against an employer under any dual capacity doctrine.[2] The injury in the present case took place subsequent to the amendment and is, therefore, distinguishable from Stelly, supra.
In the present case, we hold that plaintiff proved, by a preponderance of the evidence, that Continental's employee, Bernard Adams, cut the holes in the chain guard. The testimony of Henry Stein was quite positive in this regard, and Mr. Stein was a person who often had reason to inspect the chain guards. Robert Becnel, who also had reason to closely inspect the machinery, also testified that the holes were there during Continental's tenure and that Continental in fact installed the dust system around 1979. LeBouef and Street, who testified for Continental, did not inspect the chain guards. Vicknair testified that he did make a visual inspection and found no holes. However, there was ample and preponderating descriptive testimony that the flap covering the hole was made from the same material as the guard itself, and was difficult, if not impossible, to see unless a close detailed inspection was made; in addition, Vicknair admitted that he did not climb up to make a close inspection.
At this juncture, we note that defendant avers on appeal that it was error to allow Becnel to testify as a rebuttal witness in that he was not identified in the pre-trial order with a resulting prejudice to Continental's case. However, we take cognizance of the well established legal principle that the trial court has great discretion in controlling the presentation of evidence, including the power to admit or refuse to admit rebuttal evidence. White v. McCoy, 552 So.2d 649, 658 (La.App. 2 Cir.1989); Beecher v. Keel, 94-314 (La.App. 4 Cir. 9/29/94), 645 So.2d 666; and we said in Tracy v. Jefferson Parish Through Dept. of Public Works, 523 So.2d 266, 274 (La.App. 5 Cir.1988), as follows:
The trial judge has discretion in conducting a trial. He is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. art. 1631. His discretion includes the order of presentation of witnesses, LSA-C.C.P. art. 1632, as well as the admissibility of a witness' testimony whether that witness is brought in rebuttal or one that was not listed on the pre-trial order. LSA-C.C.P. art. 1551; see: O'Bannon v. Azar, 435 So.2d 1144 (La. App. 4 Cir.1983); Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5 Cir.1983). Further, rebuttal witnesses are not required to be listed on the pre-trial order. Brown v. Hawkins, 244 So.2d 896 (La.App. 1 Cir. 1971), writ denied 258 La. 572, 247 So.2d 393 (1971).
[Emphasis supplied].
In addition, counsel for plaintiff stated to the court that he did not learn of Becnel's identity or status as a corroborating witness until shortly before trial commenced.
Accordingly, we see no abuse of discretion by the trial court in allowing Becnel's testimony in the present case.

DUTY-RISK ANALYSIS
The Supreme Court discussed the duty-risk analysis in Meany v. Meany, 94-0251 (La. 7/5/94), 639 So.2d 229, 233-234, thusly:

*959 In order to prevail on a negligence claim, a plaintiff has the burden of proving that (1) the defendant had a duty to conform his conduct to a specific standard, (2) the defendant failed to do so, (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries, (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries, and (5) actual damages to the plaintiff occurred.
* * * * * *
A threshold issue then in any negligence action is whether the defendant owed the plaintiff a duty. This issue is a legal question for the court to decide.
* * * * * *
The court must make a policy determination in light of the unique facts of the case. Thus, the duty-risk analysis requires the court to take into account the conduct of each party as well as the particular circumstances of the case.
* * * * * *
In determining whether to impose a duty in a particular situation, the court may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of litigation; the ease of association between the plaintiff's harm and the defendant's conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the defendant's activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving.
* * * * * *
Once the court finds that a duty exists, the trier of fact must decide if that duty has been violated by the defendant. In a negligence action, the jury must decide whether defendant's conduct conformed to the standard of conduct of a reasonable man under like circumstances.
* * * * * *
Various factors considered in the `reasonable man' analysis include the likelihood of the harm; the gravity of the harm; the burden of prevention; and the social utility of the defendant's conduct.
* * * * * *
And, under traditional negligence concepts, the duty to take reasonable steps to protect against injurious consequences resulting from the risk is based on the defendant's actual or constructive knowledge.
[Citations omitted].
Applying the above concepts, we find it clear that Continental had a duty not to materially alter the chain guard in such a way so as to create an unsafe condition in the normal operation of the machinery. It had a duty not to diminish the safety feature or protective guard on the dust system, and particularly not to do so in such a way as to make the alteration difficult, or almost impossible to detect except by the users such as plaintiff.
We further find that Continental breached this duty, and that it is readily apparent that this breach was a cause-in-fact, as well as a legal cause, of the plaintiff's injuries. Once the flap is opened to allow lubrication, there is an apparent danger to the employee of coming in direct contact with moving machinery; and an event such as a barge hitting the dock (or another vessel causing a jolt) is well within the realm of possibility, even probability. The manufacturer of the system clearly incorporated the guard as a protective device; otherwise the guard had no reason to exist. Continental knew, or should have known, that it had made the task of servicing the dust collection system more dangerous by altering the mesh guard and should have corrected the condition or issued adequate warning to the immediate persons using it. Failing to do so created an unreasonable risk of harm.
Likewise, it is evident that both the Port Commission and Mitsui knew, or had constructive knowledge, that such a defect in the system existed. The Port Commission subjected the facilities to inspections which should have disclosed the defects, i.e., the holes which existed in not one, but in all 13 systems, for at least 11 years prior to plaintiff's accident. Further, Mitsui/Reserve leased, operated and maintained the facility *960 well before Dreyfus assumed the lease, and had a similar duty to discover and disclose the existence of the holes and their inherent danger.
Mitsui/Reserve must have been aware of the defect during the period it operated the facilities. Warnings should have included information about operating the machinery while the holes were open. Either the Port Commission and/or Mitsui/Reserve should have closed the holes and corrected the defect. Had Continental, the Port Commission, or Mitsui, Reserve disclosed the potentially dangerous defect, or posted warnings, reasonable to assume that Dreyfus would have been obliged to either close the holes or require their employees to use another method of lubrication, which would certainly exclude the method of greasing used by the plaintiff in this case. The fact that plaintiff did not feel that the chain guards were unsafe proves that, although the holes themselves may have been obvious, the danger of working with the altered chain guards was not so obvious.
With regard to plaintiff's fault, we agree that the danger of placing one's hand into operating machinery is obvious. However, in the present case, plaintiff did not do so, but rather fell into the system because the barge was jolted while performing his job in the way in which he was instructed. We see no comparative negligence on his part, as it appears from the evidence that he was not given the option of using the spray can, but was rather taught to use the grease gun method. However, the jury found a minimal percentage of negligence on his part, and we must give deference to this finding for the reasons to follow hereinbelow.
In the opinion of this Court, Dreyfus should bear a substantial portion of the blame for plaintiff's injuries for, among other things, its failure to utilize safe procedures such as shutting the machine down for lubrication and failure to instruct on proper methods of greasing the chains. Because we are precluded from assessing fault against Dreyfus, by the jurisprudence cited above, we must distribute the fault subject to apportion.
In doing this, we are mindful of the recent Supreme Court case of Clement v. Frey, 95-C-1119 c/w 95-C-1163 (La. 1/16/96), 666 So.2d 607. In Clement, the Supreme Court stated:
After the court of appeal finds a `clearly wrong' apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonable within the trial court's discretion.
In so doing, the Court applied the standard enunciated in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977), which had generally been held to apply to quantum awards. In Clement, supra, the Supreme Court found that the trier of fact is owed some deference in allocating fault pursuant to the comparative fault article.
Therefore, in accordance with the foregoing precepts and authorities we find the applicable percentages of fault in the present case to be as follows:

Continental-----------------50%
Port Commission-------------24%
Mitsui/Reserve--------------24%
Lee LeBlanc------------------2%
 ______
Total----------------------100%

In the case before us, we are precluded from assessing any fault against Dreyfus, the employer, and, at least to that extent, Clement is distinguishable. We believe that the above percentages reflect the (obvious) findings of the trier of fact that the appellant, Continental, is approximately half at fault for the damages to plaintiff. Further, it appears as explained hereinabove, that the trier of fact felt that the Port Authority and Mitsui/Reserve had actual or constructive notice of the defective machinery, as had Dreyfus, and meant to assess an almost equal percentage of fault to those who had such notice and failed to correct or warn.[3] Unable to apportion fault to the employer, we have reallocated it to the remaining liable defendants as indicated above.

*961 DAMAGES

Because of the error made by the trial court, our de novo review of the evidence is limited to the issue of liability. We do not find that the determination of the court to (improperly) apportion fault to Dreyfus affects that portion of the jury's verdict regarding quantum of damages.
La.C.C. art. 2324.1 reads as follows:
In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.
Consideration of the jury's determination of damages is limited to a review for manifest error or abuse of discretion on appeal. The discretion vested in the trier of fact is "great," and even vast, in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), certiorari denied, Maritime Overseas Corp. v. Youn, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). When damages are not susceptible of precise measurement, much discretion is left to the trial court for its reasonable assessment. La.C.C. art. 1999; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination of an abuse of discretion or manifest error is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point that is reasonably within that discretion. Youn, supra.
Plaintiff was, and is a manual laborer. Because of his injuries, he must endure pain and discomfort doing the most ordinary parts of his job. His disability requires him to be more than normally cautious and, therefore, places him in more than normal danger each time he climbs. He even experiences difficulty in daily tasks such as dressing himself and can no longer engage in carpentry work at home. He had to undergo two amputations of his fingers and suffered for many months with pain, tenderness and swelling. He has a substantial anatomical impairment of his hand, and he also is a man who works with his hands.
Considering the particular injuries of the plaintiff in this case, while the damages awarded by the jury may be somewhat on the high side, they are not so high so as to constitute an abuse of the vast discretion accorded to the jury. See e.g. Fontana v. Coca-Cola Enterprises Inc., 632 So.2d 811 (La.App. 4 Cir.1994). Therefore we decline to disturb the quantum of the award on appeal and will affirm same.

DECREE
For the foregoing reasons, the verdict and judgment of the court is amended to reflect that the negligence of the parties is apportioned as follows:

Continental-------------------------50%
Port Authority----------------------24%
Mitsui/Reserve----------------------24%
Lee LeBlanc--------------------------2%
 ______
Total------------------------------100%

In all other respects the judgment is affirmed.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] La.C.C. art 2324 reads:

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in Paragraph A of this Article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise. (Emphasis added).
[2] La.R.S. 23:1032(A)(1)(b) reads as follows:

(b) This exclusive remedy is exclusive of all claims, including any claims that might arise against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal under any dual capacity theory or doctrine.
[3] In the jury verdict, 7% of fault was allocated to Mitsui/Reserve, 7% to the Port Commission, and 29% to Dreyfus for a total of 43% of the fault.