# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #023

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **9th day of May, 2025** are as follows:

**BY Weimer, C.J.:**

2024-C-00802
c/w
2024-C-00806

*BRADLEY DAY AND TRACEY DAY  VS.   ELVIS DEAN THOMPSON, ET AL. (Parish of Calcasieu)*

AFFIRMED. SEE OPINION.

Crain, J., concurs and assigns reasons.
Guidry, J., concurs.
Knoll, J., concurs in part, dissents in part and assigns reasons.

# SUPREME COURT OF LOUISIANA

## No. 2024-C-00802

## C/W

## No. 2024-C-00806

## BRADLEY DAY AND TRACEY DAY

## VS.

## ELVIS DEAN THOMPSON, ET AL.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT,*
*PARISH OF CALCASIEU*

**WEIMER, Chief Justice**[1]

We granted certiorari in this case to consider whether the district court erred in excluding surveillance evidence the defendants procured during trial for impeachment purposes and whether, if erroneous, the exclusion of the evidence was prejudicial. Finding an abuse of discretion in the district court's failure to conduct an *in camera* review of the surveillance evidence prior to ruling, our independent review of the proffered evidence convinces this court that its exclusion was nonetheless proper. The surveillance does not depict plaintiff doing anything she testified she cannot do and, thus, is not impeachment material. Therefore, the judgment below is affirmed.

## FACTS AND PROCEDURAL HISTORY

This case arises from a motor vehicle accident on March 31, 2017. On that date, Elvis Dean Thompson was operating an 18-wheeler on Interstate 210 in Calcasieu Parish when he rear-ended a vehicle being driven by Tracey Day. Mrs.

---

[1] Justice Jeannette Theriot Knoll, retired, heard this case as Justice Pro Tempore, sitting in the vacant seat for District 3 of the Louisiana Supreme Court. She is now appearing as Justice ad hoc for Justice Cade R. Cole.

Day's vehicle in turn struck a vehicle being driven by Teresa Jeffries. After striking Mrs. Day's vehicle, Mr. Thompson swerved and collided with another vehicle in an adjacent lane of travel. That vehicle was being driven by Daniel Guidry. At the time of the accident, Mr. Thompson was in the course and scope of his employment with Terry Graham Trucking, Inc., the owner of the 18-wheeler Mr. Thompson was driving.

Mrs. Day and her husband, Bradley Day, filed suit against Mr. Thompson, Terry Graham Trucking, and its insurer, Prime Insurance Company, seeking recovery for the damages Mrs. Day sustained in the accident. Mr. Day additionally asserted a claim for loss of consortium.[2] The Days' suit was consolidated with a suit filed by Ms. Jeffries, but was severed shortly before the Jeffries' case went to trial.

Trial on the Days' suit was set for September 20, 2021, but that date was upset when counsel for Prime Insurance Company filed a motion for continuance based on counsel's displacement by Hurricane Ida, which made landfall on August 29, 2021. The Days did not oppose the motion for continuance, but did request that no further discovery be allowed. Trial was then reset for January 3, 2022. After the district court issued a standard scheduling order for the reset trial date, the Days filed a motion to amend the order to reflect the court's ruling that there would be no further discovery beyond what had already been scheduled as of the date of the continuance. That motion was granted.

On the morning of January 3, 2022, the first day of the scheduled jury trial, counsel for the Days requested that Mrs. Day be excused from attending trial, except for the purpose of testifying, based on the recommendation of her psychiatrist and

_____

[2] Also named as plaintiffs in the lawsuit were the Days' minor children, who were subsequently dismissed from the proceeding, along with the Days' uninsured/underinsured motorist insurer, GEICO, which had been named as a defendant.

because "[i]t's very difficult for her to sit for longer than about 30 minutes or so." Defense counsel objected, arguing the jury's ability to observe Mrs. Day and her capabilities insofar as her attention span and ability to sit through trial are concerned is "an absolute integral part of the case, especially with [sic] it relates to her claims for future losses and lost wages." The district court granted the Days' request and excused Mrs. Day from attending the entire trial, reasoning that the jury would have an opportunity to observe Mrs. Day when she testified.

The jury was selected on January 3, and the Days began presenting their case on the following day. On January 6, following the testimony of both Mr. and Mrs. Day, counsel for the Days informed the district court that he had just received a supplement to discovery from counsel for Prime disclosing that defendants had obtained surveillance video of Mrs. Day over the course of the preceding two days, January 4 and 5. Prime's counsel acknowledged obtaining the surveillance video, explaining it was requested after Mrs. Day's surprise representation on the first day of trial that she could not physically sit through the entire trial, and argued that the video, and the testimony of the private investigator who recorded the video, Jody Clavier, were admissible as impeachment evidence. After hearing briefly from the parties, the district court indicated it would review the relevant law overnight and entertain argument the following morning and decide then whether to conduct an *in camera* inspection of the video.

The following morning, the court heard argument. Counsel for Prime again explained that the defendants were surprised by Mrs. Day's claim that she could not be in court for the entirety of the trial, and hired Mr. Clavier to determine if her testimony was truthful. According to counsel, Mr. Clavier followed Mrs. Day and observed her sitting in a BMW sedan for fifty minutes and walking her dogs for

3

longer than five minutes. Counsel indicated that defendants' discovery responses had been supplemented at 1:45 that morning with the video footage taken by Mr. Clavier, and asked that the surveillance video and the testimony of Mr. Clavier be admitted as impeachment evidence, citing **Detellier v. Smith**, 94-34 (La.App. 5 Cir. 5/31/94), 638 So.2d 445.

Counsel for the Days objected to the introduction of the evidence on several grounds. Counsel pointed out that (1) discovery had been closed as of September 9, 2021; (2) the court had previously disallowed surveillance evidence obtained by defendants after the discovery cut-off, but prior to commencement of trial; (3) there was not sufficient time for plaintiffs to determine the veracity of the videotapes, or whether they had been "tinkered with;" and (4) counsel would be unable to rehabilitate the Days' testimony since both Mr. and Mrs. Day had already testified.

After considering the parties' arguments, the district court ruled that both the surveillance video and the testimony of Mr. Clavier, the private investigator, would be excluded from evidence. Trial then resumed with the presentation of the defendants' case, and concluded that same day.

At the conclusion of trial, the jury rendered a verdict in favor of the Days in the total amount of $3,926,849.17. Forty percent of the fault for the accident was allocated to Mr. Thompson, and 60 percent was allocated to Terry Graham Trucking. A judgment was signed accordingly.[3] Defendants appealed.

On appeal, the defendants asserted that the district court erred in excluding the surveillance video obtained during trial and the testimony of private investigator

---

[3] Pursuant to a Partial Motion for New Trial, language casting Prime Insurance, which had exhausted its $1,000,000.00 policy limits, was removed from the judgment except for casting Prime with interest on the first million dollars of the judgment from the date of judicial demand until March 3, 2022, when Prime's policy limits were exhausted in connection with the suit filed by Ms. Jeffries.

Clavier, who filmed the video, arguing the evidence was admissible impeachment evidence and its exclusion was prejudicial.[4] Citing the reasons given by the district court for excluding the evidence–the delay in the proceedings that would have resulted, the agreement among the parties to close discovery when the trial was postponed for Prime's counsel, and the last-minute production of the evidence during the middle of trial–along with the broad discretion afforded the district court in ruling on the admissibility of evidence, the court of appeal found no error in the district court's exclusion of the evidence, and affirmed the judgment below. **Day v. Thompson**, 23-301, pp. 10-11 (La.App. 3 Cir. 5/22/24), 388 So.3d 1217, 1225.

Upon application of defendants, this court granted certiorari to review the correctness of the lower courts' evidentiary ruling. **Day v. Thompson**, 24-00802 (La. 11/20/24), 396 So.3d 60 and 24-00806 (La. 11/20/24), 396 So.3d 61.[5]

### LAW AND ANALYSIS

The narrow issue presented in this case is whether the district court erred in excluding surveillance evidence the defendants procured during trial for impeachment purposes. The evidence itself consists of two types: (1) surveillance video; and (2) testimony from the private investigator who recorded the video, Jody Clavier, regarding how he obtained the video and the behavior he personally observed in the course of his surveillance. The district court excluded both. This court is called on to determine whether that decision was an abuse of the district court's great discretion in determining the admissibility of evidence at trial. **Medine v. Roniger**, 03-3436, p. 6 (La. 7/2/04), 879 So.2d 706, 711. ("Generally, a district court is afforded great discretion concerning the admission of evidence at trial, and its decision to admit or

---

[4] Defendants did not appeal the damage award.

[5] The separate applications of the defendants have been consolidated for consideration by this court.

5

exclude evidence may not be reversed on appeal in the absence of an abuse of that discretion.")

Our inquiry begins with the relevant statutory provision. La. C.C. art. 1; **Duckworth v. Louisiana Farm Bureau Mut. Ins. Co.**, 11-2835, p. 12 (La. 11/2/12), 125 So.3d 1057, 1064. ("In Louisiana, as in other civil law jurisdictions, legislation is superior to any other source of law."). The admissibility of impeachment/rebuttal evidence is controlled by La. C. E. art. 607(D)(2), which provides:

> Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

As this court has recognized, the "other extrinsic evidence" referenced in this article includes within its ambit surveillance videotape, which can be used as substantive, corroborative, or impeachment evidence at trial. **Wolford v. JoEllen Smith Psych. Hosp.**, 96-2460, p. 2 (La. 5/20/97), 693 So.2d 1164, 1166. Indeed, as the **Wolford** court explained, the credibility of the plaintiff in a personal injury case is key, and surveillance videotape can be a critical means of testing the plaintiff's credibility with respect to the physical injuries and limitations claimed. *Id.*, 96-2460 at 5, 693 So.2d at 1167. Nevertheless, as the court also recognized, surveillance video may not be totally reliable, may be taken out of context, and is vulnerable to manipulation through various editing techniques. *Id.*, 96-2460 at 6, 693 So.2d at 1168. For that reason, **Wolford** held that while a defendant may delay production of a videotape until after the plaintiff's deposition, the plaintiff is entitled to production of any videotape a reasonable time before trial, so as to give the plaintiff ample time to discover any weaknesses in the video. *Id.*

6

While **Wolford** specifically addressed the pre-trial discovery of surveillance videotape, and this case involves surveillance videotape obtained during trial, we note that with the advent of artificial intelligence[6] and technological advancements in cameras and editing, the risk of manipulation has greatly increased. Therefore, as **Wolford** recognizes, and as reaffirmed today, it is important to the search for truth, which is the fundamental purpose of any adversarial proceeding, that the plaintiff be provided a meaningful opportunity to assess the authenticity of and any weaknesses in any surveillance video. That being said, La. C.E. art. 607(D)(2) does not distinguish surveillance video from any other type of extrinsic evidence which is introduced to attack a witness' credibility, and, with the above caveat, the same standards of admissibility apply to surveillance video as to any other type of impeachment evidence, whether procured pre-trial or during the course of trial.

In this case, the defendants sought to admit surveillance video obtained during trial for the purpose of discrediting Mrs. Day's contention, advanced for the first time on the first day of trial, that the injuries she sustained in the accident prevented her from attending the entire trial. Defendants also sought to introduce testimony of the private investigator who recorded the video and his personal observations of Mrs. Day over the course of his surveillance.

The district court ruled the evidence inadmissible, largely on the finding "that it'd be nonsensical and inconsistent with my Pretrial Order to now let surveillance in," and because "it'd be unfair for the plaintiff not to have an opportunity to investigate and, otherwise, check the veracity of the video." However, the district

---

[6]"Artificial intelligence" is defined as the capability of computer systems or algorithms to imitate intelligent human behavior. MERRIAM-WEBSTER.COM DICTIONARY, *Artificial Intelligence,* https://www.merriam-webster.com/dictionary/artificial%20intelligence (last visited April 15, 2025)

court issued this ruling without first conducting an *in camera* inspection of the video,[7] and without the benefit of the proffer of Mr. Clavier's testimony,[8] apparently on the belief such an inspection or review is not necessary or relevant "unless the law tells me that I can let it in."

The district court's impression that an *in camera* inspection was not necessary in this instance is mistaken. The plain language of La. C.E. art. 607(D)(2), which addresses the admissibility of extrinsic evidence, declares that "[o]ther extrinsic evidence ... *is* admissible when offered solely to attack the credibility of a witness *unless* the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." (Emphasis added.) Pursuant to this language, extrinsic evidence attacking the credibility of a witness *is* admissible, and the law directs "that it can be let in" or admitted into evidence, subject to the balancing test delineated in the article: the assessment as to whether the probative value of the evidence is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. It is axiomatic that such a balancing test cannot be performed in a vacuum. In other words, the probative value of the evidence on the issue of credibility cannot be assessed without first examining the evidence, which the district court declined to do in this case. See and compare,

_____

[7] While plaintiffs maintain that the district court did in fact review the video, the district court's own words belie that contention. When defendants asked the court to conduct an *in camera* review prior to ruling, the plaintiffs objected, and the district court responded: "I don't think the inspection is relevant unless the law tells me that I can let it in. If I can let it in, I would like to do an in-camera inspection so that I can decide beforehand how much I should show to the jury." The next morning, without asking to see the video, the district court issued its ruling refusing to admit the evidence, noting that "it would just be unfair to ask the plaintiff now to prepare for even a dishonest client, "*if that is what the video would show*." (Emphasis added.) These comments indicate the court did not review the video footage.

[8] A proffer of Mr. Clavier's testimony was made after the district court's adverse ruling and after the jury had retired for deliberations.

8

**Detillier,** 638 So.2d at 448, wherein surveillance video made during trial "was screened, out of the jury's presence, by the trial judge, counsel, and defendants' expert medical witness" prior to its being admitted into evidence.[9]

The district court compounded its error in refusing to conduct an *in camera* review of the proffered videotape when it also ruled without the benefit of hearing Mr. Clavier's proffered testimony because, according to the district court, Mr. Clavier was "basically a spoken, walking version of the video" and "was not on the list–witness list." However, to the extent Mr. Clavier was testifying regarding behavior he personally observed, that testimony had relevance independent of the videotape. See, **Detillier**, 638 So.2d at 449 ("Nor did the trial court err in permitting the private investigator to testify regarding behavior that he himself observed but which was not recorded on the videotape .... [He] was testifying as a fact witness, not as an expert, and his testimony was admissible on that basis.") Moreover, as a rebuttal witness, Mr. Clavier's identity was not required to be disclosed prior to trial. See, **Detiller**, 638 So.2d at 448 ("[D]isclosure [of documentary impeachment evidence or rebuttal witnesses] is not mandated either by the Code of Civil Procedure or the Code of Evidence.");**Tracy v. Jefferson Par., Dep't. of Pub. Works**, 523 So.2d 266, 274 (La.App. 5th Cir. 1988) ("[R]ebuttal witnesses are not required to be listed on the pre-trial order."). This is particularly true where the defense could not

---

[9]  To the extent the district court's ruling was based on the conclusion that the pre-trial order controlled the course of these proceedings and was not subject to modification, La. C.C.P. art. 1551(B) provides that a pre-trial order may be "modified at the trial to prevent manifest injustice." In his reasons, the district court expressly acknowledged the special circumstances that prompted the defendants to conduct mid-trial surveillance, noting that "you didn't see this coming," and "you had no way of knowing that Mrs. Day was going to come in and request not to sit at the table." The court even went so far as to comment that "I think it was wise of you. I think it was a worthwhile risk ..." suggesting that the defendants' conduct in ordering surveillance after the discovery cut-off was justified, and that it presents the type of circumstance in which modification of the pre-trial order might be warranted. In any event, the determination of whether such modification should be effected in order to "prevent manifest injustice," cannot properly be made without first examining the evidence itself to assess its probative value.

have reasonably anticipated the need for rebuttal, a circumstance the district court conceded was the case here, when the court remarked: "I do think that you had no way of knowing that Mrs. Day was going to come in and request not to sit at the table." See, **Lewis v. Wal-Mart Stores, Inc.**, 525 So.2d 93, 96 (La. App. 3 Cir. 1988) (The requirement to list witnesses "does not apply to rebuttal witnesses the necessity of whose testimony cannot be reasonably anticipated before the time of trial.").[10] Therefore, to the extent that the district court refused to entertain a proffer of Mr. Clavier's testimony prior to ruling on its admissibility because his name was not listed on the witness list, that refusal was erroneous.[11]

Based on the foregoing, this court finds that the district court abused its discretion in excluding the surveillance evidence obtained by defendants without first conducting an *in camera* review of that evidence. Because both the video evidence and the testimony of Mr. Clavier were proffered, the court is able to conduct a *de novo* review of the excluded evidence to determine its admissibility on the basis of the balancing test set forth in La. C.E. art. 607(D)(2). See, **Hicks v. USAA General Indemnity Company**, 21-00840, pp. 12-13 (La. 3/25/22), 339 So.3d 1106, 1115-1116 (when legal error is found and the record is otherwise complete, the appellate court should conduct its own *de novo* review of the evidence). Having reviewed the evidence in its entirety, this court finds that had the district court conducted the necessary *in camera* review, the result in this case would be the same. The evidence

---

[10] This is not to suggest the defendants were not required, pursuant to plaintiffs' discovery requests for surveillance video, to produce the videotapes to plaintiffs once they were obtained. Surveillance video is discoverable whether or not it is to be used at trial. **Moak v. Illinois Cent. R. Co.**, 631 So.2d 401, 405 (La. 1994). However, the record reflects that defendants updated their discovery responses and notified plaintiffs of the existence of the surveillance video once it was obtained.

[11] In any event, defendants did disclose their intent to call "any witness necessary for impeachment or rebuttal purposes" in witness lists submitted pursuant to the district court's Pretrial Scheduling Order, demonstrating substantial compliance with that order.

was properly excluded because it does not contradict or discredit any testimony of the plaintiffs and, thus, has no probative value with respect to plaintiffs' credibility. In short, it is not impeachment evidence.

While La. C.E. art. 607 governs the admissibility of extrinsic evidence for impeachment purposes, before such evidence can be introduced, a proper foundation must be laid. To that end, La. C.E. art. 613 provides:

> Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.

Pursuant to this article, before evidence that attacks a witness' credibility can be introduced, the witness must be presented with a fact and afforded the opportunity to admit that fact. If the witness admits the fact, the evidence sought to be introduced does not challenge the witness' truthfulness and, thus, is not impeachment evidence subject to the balancing test of La. C.E. art. 607.

In this case, the defendants claimed surprise when, on the first day of trial, counsel for the Days requested that Mrs. Day be excused from attending trial, except for the purpose of testifying, because she was unable to sit for longer than 30 minutes. To controvert this assertion, defendants retained private investigator Jody Clavier to conduct surveillance of Mrs. Day. Mr. Clavier surveilled Mrs. Day over the next two days. That surveillance produced two videos: one recorded on January 4, lasting approximately one minute and 54 seconds; and a second recorded the next day, lasting 18 minutes and 19 seconds. In his proffer, Mr. Clavier described what he observed while intermittently filming. According to Mr. Clavier, on the first day of surveillance, Mrs. Day exited the hotel where the Days were staying with two dogs

11

on leashes. She walked down a slight incline on the back side of the hotel and over concrete curbing with no issues. A couple of times, she dropped the dogs' leashes and bent fully from the waist to pick them up. Later, he observed Mrs. Day enter her husband's small BMW sedan, unassisted. Mr. Clavier followed the couple to Kohl's department store, where Mrs. Day remained in the vehicle while her husband went into the store, returning after about 15 minutes. The Days then drove back to the hotel. Mr. Clavier estimated that Mrs. Day sat in the car continuously, without getting out or standing up, for approximately 35 to 40 minutes. The time stamps on the corresponding video indicate that the trip to Kohls lasted approximately 50 minutes.

Mr. Clavier then testified that on the following day, he observed Mrs. Day walking her dogs on three occasions. He noted that at one point, Mrs. Day walked the dogs with a phone resting on her shoulder, holding it to her ear while she talked. Mr. Clavier indicated that the longest period of time Mrs. Day walked her dogs was "probably over an hour." The corresponding video for that day shows Mrs. Day walking her dogs for less than two minutes, for ten minutes, and finally for approximately 36 minutes.

Defendants contend that the foregoing surveillance is impeachment evidence because it contradicts Mrs. Day's claim that she was unable to sit for longer than 30 minutes and therefore unable to attend the entire trial, that she walks with a limp, and that she cannot walk her dogs for longer than five minutes. The problem with this contention is that Mrs. Day did not testify that she was unable to sit in a car for extended periods, that she walks with a limp, or that she could not walk her dogs for longer than five minutes, nor was she asked whether she could do so.

12

During his cross-examination, defense counsel attempted to lay a foundation for impeachment by asking Mrs. Day how she arrived in Louisiana (she and her husband drove from Oklahoma in Mr. Day's BMW); whether she "mostly" stayed in the hotel (she mostly stayed in the hotel, had not gone out to a restaurant, on shopping trips or to the movies, for the most part carrying food in); whether she had been tending to the dogs, carrying them, picking up after them (she takes the dogs outside, does not pick them up and has not cleaned up after them because the hotel does not have waste bags); whether she can move her neck from side to side (she can); what's the heaviest thing she can carry (she has a weight restriction of 20 pounds); how much her dogs weigh (about 7 pounds and 12-13 pounds, respectively); and, finally, when she has walked her dogs at the hotel, "how long do you usually take them out for" (about five minutes). Nothing in Mrs. Day's responses to these questions is contradicted by or inconsistent with the surveillance evidence.

In fact, Mrs. Day testified on direct examination that she rode seven hours in her husband's car to attend trial, but that it caused her a lot of pain. Mr. Day confirmed that his wife could ride in a car for extended periods of time, but also testified that it caused her pain to do so. He further testified that Mrs. Day can feed their dogs and pick up after them.

Clearly, then, Mrs. Day did not testify that she was unable to sit for longer than 30 minutes or that she was unable to sit in a car for extended periods, as defendants maintain, and defense counsel did not pose that precise question to her. There is nothing in Mr. Clavier's testimony or the surveillance video (showing Mrs. Day sitting for 50 minutes in the same car she testified she sat in for seven hours to attend trial) that contradicts, undermines, or discredit's Mrs. Day's testimony.

13

The same is true as respects the contention that Mrs. Day claimed she was unable to walk her dogs for longer than five minutes. Mrs. Day did not testify that she was unable to walk her dogs for longer than five minutes and defense counsel did not ask her whether she could walk her dogs for longer than five minutes, or whether, in fact, she had done so. Rather, counsel asked Mrs. Day how long she "usually" walked her dogs, and she responded: "About five minutes. We walk from the hotel to the grassy area for them to go to the bathroom and then we go back up to the room." The surveillance evidence does not contradict or discredit Mrs. Day's testimony in this regard.

Finally, although Mr. Day did testify on direct examination that his wife's gait is different from how it appeared before her accident, and that she walks with "a pronounced limp, if you will, I guess," he was not asked to and did not describe what that limp looks like. Mrs. Day was not questioned about her gait at all. In particular, she was not asked whether she can walk without a limp, a question that would have laid a foundation for impeachment. In the absence of that foundation, there is no basis to challenge Mrs. Day's credibility with extrinsic evidence.

After conducting a *de novo* review of the surveillance evidence, this court finds that, in the final analysis, the proffered evidence does not contradict or discredit Mrs. Day's testimony. Neither the surveillance video nor the testimony of Mr. Clavier depict Mrs. Day doing anything she testified she cannot do and, thus, the evidence is not impeachment evidence, and a proper foundation was not laid for its introduction.

## CONCLUSION

The admissibility of extrinsic evidence to attack the credibility of a witness, particularly as regards surveillance videotape which, as noted, is vulnerable to manipulation, must be determined on a case-by-case basis, in accordance with the

14

unique facts and circumstances of each case and the balancing of factors set forth in La. C.E. art. 607 (D)(2). That balancing can only occur after an *in camera* review of the evidence. In this instance, the district court erred in failing to conduct that review, but the exclusion of the surveillance evidence was nonetheless proper, as the evidence does not contradict or discredit the witness' testimony and, thus, is not impeachment evidence. The surveillance evidence was properly excluded; therefore, the judgment below is affirmed.

**AFFIRMED.**

**SUPREME COURT OF LOUISIANA**

**No. 2024-C-00802**

**C/W**

**No. 2024-C-00806**

**BRADLEY DAY AND TRACEY DAY**

**VS.**

**ELVIS DEAN THOMPSON, ET AL.**

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Calcasieu

**CRAIN, J., concurring.**

I agree the trial court erred in failing to review the surveillance video before ruling it inadmissible. Under the circumstances, I also find the trial court erred in excluding the testimony of the investigator who took the surveillance. He should have been allowed as a fact witness who specifically viewed plaintiffs' activities after the defense learned plaintiff would not be present during the trial. The excluded evidence was proffered; therefore, *de novo* review is proper. Ultimately, since the evidence fails to rebut anything said by plaintiff, the trial court's errors were harmless. I write separately to emphasize the error in the trial court's rulings.

The surveillance was justified. The video was not excluded by the pre-trial order because the surveillance was not relevant until plaintiff made known at the beginning of trial that she would present new evidence of her condition through her absence from trial for physical reasons. The defense then provided appropriate notice before offering the video as impeachment evidence. Trial courts must be vigilant in keeping the adversarial playing field level. The trial court's rulings in this case failed to do that. Since *de novo* review reveals the trial court's errors were ultimately harmless, I concur.

# SUPREME COURT OF LOUISIANA

## No. 2024-C-00802

## C/W

## No. 2024-C-00806

## BRADLEY DAY AND TRACEY DAY

## VS.

## ELVIS DEAN THOMPSON, ET AL.

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Calcasieu

**KNOLL, J.,[1] concurs in part, dissents in part, and assigns the following reasons:**

I concur with the majority opinion in finding the surveillance video is not impeachment evidence. For several reasons, however, I find the majority opinion clearly errs in determining the District Court abused its vast and immense discretion. Moreover, the majority opinion further errs by making an assumption outside the record[2] to reach its abuse of discretion determination, which ultimately renders the opinion internally inconsistent and confusing.

Plaintiff, Tracey Day, was seriously injured on March 31, 2017, when defendant Elvis Thompson rear-ended her vehicle with the 18-wheeler truck he was driving on Interstate 210 in Calcasieu Parish near Lake Charles, Louisiana. Because of the severity of her injuries, Mrs. Day's cervical spine and right hip were fused with steel rods, causing her pain, discomfort, and disabilities. Notably, the defendants' expert, Dr. Kelly Scrantz, testified Mrs. Day appeared to be straightforward with him about her injuries both when he examined her prior to trial

---

[1] Justice Jeannette Theriot Knoll, retired, heard this case as Justice *Pro Tempore*, sitting in the vacant seat for District 3 of the Louisiana Supreme Court. She is now appearing as Justice *ad hoc* for Justice Cade R. Cole.

[2] See *Day v. Thompson*, 24-00802 c/w 24-00806, p.8 n.7 (La. --/--/--), --- So. 3d ----.

1

and in the courtroom; further, Dr. Scrantz did not, at any point, testify Mrs. Day was exaggerating her injuries. The jury's quantum award of $3,926,849.17 was not contested on appeal. The defendants' surveillance of Mrs. Day was an effort to discredit her, notwithstanding the strong medical evidence supporting her complaints.

In reviewing this case, the Third Circuit Court of Appeal properly examined the record for abuse of discretion by the trial Judge. Whether there was an abuse of discretion was the sole issue before that Court, and now, it is the sole issue before this Court. Relying heavily on both the trial Judge's oral reasons and landmark jurisprudence concerning video surveillance evidence, the Third Circuit affirmed the District Court's judgment, finding no abuse of the District Court's discretion.

As correctly noted by the majority, the admissibility of impeachment/rebuttal evidence is set forth in La. C.E. art. 607(D)(2). As such, the trial judge acts as the "gatekeeper" of admissibility of evidence during trial. The trial judge is afforded vast discretion in conducting trial proceedings and ruling on evidentiary issues. La. C.C.P. art. 1631(A); *see also Tassin v. State Farm Mutual Automobile Ins. Co.*, 20-00652, p. 2 (La. 10/14/20), 302 So. 3d 1098, 1099.

Here, the trial Judge, in his gatekeeping function, provided sound and thorough reasons for excluding the video surveillance footage and testimony of Mr. Clavier, stating:

> [I]t's axiomatic for me to say – to, at this point, to do anything other than exclude this evidence. And here's why […] [i]t's been five years, four and a half years. In four and a half years you couldn't go and get some video prior to the close of discovery of her going to Ross or getting in a sedan or riding a bike or riding a horse. […] [Plaintiffs] would have to basically have time to challenge the veracity of the video and see whether certain parts would be excluded. There's a lot that would have to be done that would delay this case and that would be unduly fair, unduly fair. I mean, it's just – it would just be unfair to ask the plaintiff now to prepare for even a dishonest client, if that is what the video would show. Because four years ago you could have decided that she was being dishonest. […] It's just not going to work at this point. I find

2

that it'd be nonsensical and inconsistent with my Pretrial Order to now let surveillance in. And I said surveillance couldn't come in on December 15th and when we had our last hearing. […] [W]e're not going to expand upon what everybody has been preparing for for all these years. So, for that reason, it'd be unduly fair, it'd be unfair to the plaintiff not to have an opportunity to investigate and, otherwise, check the veracity of the video. I think in the interest of fundamental fairness, I must exclude not only the video, but the testimony of Mr. Jody Clavia.

Clearly, the trial Judge's reasons do not support a finding of abuse of his wide, vast, and great discretion as the gatekeeper of the trial over which he was presiding; this reasoning is consistent with our statutory law and jurisprudence. The majority opinion, however, cherry-picks from the trial Judge's thorough and sound reasons for excluding the video surveillance footage at trial.[3] It makes the *assumption* that the trial Judge did not conduct an *in camera* review of the surveillance footage,[4] and further errs by relying on a misapplication of *Detillier v. Smith*, 94-34 (La. App. 5 Cir. 5/31/94), 638 So. 2d 445.

Footnote 7 of the majority opinion states:

While plaintiffs maintain that the district court did in fact review the video, the district court's own words belie that contention. When defendants asked the court to conduct an in camera review prior to ruling, the plaintiffs objected, and the district court responded: "I don't think the inspection is relevant unless the law tells me that I can let it in. If I can let it in, I would like to do an in-camera inspection so that I can decide beforehand how much I should show to the jury." The next morning, without asking to see the video, the district court issued its ruling refusing to admit the evidence, noting that "it would just be unfair to ask the plaintiff now to prepare for even a dishonest client, "if that is what the video would show." (Emphasis added.) These comments **indicate** the court did not review the video footage.[5] (Emphasis added.)

The record does not establish whether or not the trial Judge had and/or reviewed the video surveillance footage. The plaintiffs assert he did conduct *an in camera* review of the video surveillance footage; the defendants maintain he did not.

---

[3] *Id.* at p.9, n.9.

[4] *Id.* at p.8, n.7.

[5] *Id.*

No one asked the trial Judge if he conducted an *in camera* review of the surveillance footage prior to giving his reasons for excluding it at trial. The majority opinion states, in pertinent part: "These comments indicate the court did not review the video footage." Again, here, the majority draws an **assumption** not based on record evidence. This is a clear breach of our duty to "shall render any judgment which is just, legal, and proper upon the record on appeal." La. C.C.P. art. 2164; *see also Barnett v. Barnett*, 477 So. 2d 1289, 1291 (La. App. 3 Cir. 1985). As a reviewing court, we are called to examine record evidence alone. There are no exceptions to this rule or practice. It is critical to our function to review only the evidence *in the record*.

The majority opinion further errs by misapplying *Detillier v. Smith*, 94-34 (La. App. 5 Cir. 5/31/94), 638 So. 2d 445. In *Detillier*, the court of appeal affirmed the admission of surveillance footage obtained during trial because, importantly, there was no pretrial order requiring the disclosure of documentary impeachment evidence or rebuttal witnesses, nor did the plaintiff submit in discovery interrogatories or requests for production of documents regarding video footage of the plaintiff. *Id.*, 94-34, 638 So. 2d at 448. By contrast, here, plaintiffs propounded interrogatories and requests for production to defendants in discovery specifically pertaining to video surveillance.

In this matter, the District Court excluded the surveillance taken during trial in the interest of fundamental fairness; namely, because its admission "would be unfair" and would deny the plaintiff the "opportunity to investigate and, otherwise, check the veracity of the video." The District Court's reasoning for the exclusion was thorough; it cited the defendants' ample time—four-and-a-half years—to hire a private investigator and obtain such surveillance footage prior to the close of discovery. It also noted its previous exclusion of other surveillance evidence a week before the original trial date setting in 2021.

4

In 2021, defendants similarly sought to introduce video surveillance, and the District Court ruled on the admissibility of that surveillance footage at a hearing a week before trial. There, the District Court viewed and excluded the footage primarily because the plaintiff did not have an opportunity to investigate it and challenge its veracity; secondarily, the court considered the poor quality of the video. Given the District Court's previous exclusion of video surveillance footage one week prior to the first trial date setting on grounds of unfairness to the plaintiff, it would be inconsistent for the judge to later admit such footage obtained and presented *during* trial.

The majority opinion correctly finds the admissibility of video surveillance evidence to be vulnerable to manipulation. This concept is well-documented by Justice Walter Marcus in the landmark decision *Wolford v. JoEllen Smith Psych. Hosp.*, 96-2460 (La. 5/20/97), 693 So. 2d 1164, which has provided guidance to our lower courts for nearly thirty years on this issue. Since the *Wolford* case was decided, the dangers posed by surveillance video evidence have been exponentially magnified with the advancements of artificial intelligence and deepfake technology. Here, the majority opinion notes:

> [W]ith the advent of artificial intelligence and technological advancements in cameras and editing, the risk of manipulation has greatly increased. Therefore, as *Wolford* recognizes, and as reaffirmed today, it is important to the search for truth, which is the fundamental purpose of any adversarial proceeding, that the plaintiff be provided a meaningful opportunity to assess the authenticity of and any weaknesses in any surveillance video.[6]

In my view, this acknowledgment of the important right of a plaintiff to be afforded the opportunity to examine surveillance should have been the focus of the opinion rather than the *in camera* review of the video surveillance footage by the trial Judge, which is a "red herring" issue.

---

[6] See *Day v. Thompson*, 24-00802 c/w 24-00806, p. 7 (La. --/--/--), --- So. 3d ----.

5

In my view, the majority strays from the guidance provided by *Wolford* in stating:

> That being said, La. C.E. art. 607(D)(2) does not distinguish surveillance video from any other type of extrinsic evidence which is introduced to attack a witness' credibility, and, with the above caveat, the same standards of admissibility apply to surveillance video as to any other type of impeachment evidence, whether procured pre-trial or during the course of trial.[7]

This statement is not correct and is largely misleading. Louisiana Code of Evidence article 607(D)(2), found in Chapter 6 of the Code of Evidence under the title "Witnesses," simply signifies that other extrinsic evidence is admissible to attack the credibility of a witness. This Article does not address the authentication of extrinsic evidence. Within Chapter 9 of the Code of Evidence, titled "Authentication and Identification," Article 901(A) provides:

> A. General Provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Extrinsic evidence must be authenticated in order to show the evidence at issue "is what its proponent claims." In my view, the majority's interpretation of this article implies the authentication of extrinsic evidence is not required, as it reasoned that Art. 607(D)(2) "[…] does not distinguish surveillance video from any other type of extrinsic evidence […]." This "caveat" is not correct and belies our jurisprudence.

A review of our jurisprudence, starting in 1994 with *Detillier (*before *Wolford* in 1997), demonstrates video surveillance evidence is treated differently than other extrinsic evidence. Further, this statement is inconsistent—the majority reaffirms *Wolford*, which advocates for the authentication of video surveillance evidence.

Moreover, the majority is further inconsistent insofar as it finds that, "[…] the plaintiff be provided a meaningful opportunity to assess the authenticity of and any

---

[7] *Id.*

6

weakness in any surveillance video," yet also finding the trial Judge to have erred in failing to review *in camera* the defendants' unauthenticated video surveillance footage. This inconsistency is further compounded by the majority's *de novo* review of this unauthenticated surveillance video.[8]

The defendants are not without a remedy if they believe a plaintiff is or will be untruthful at trial. For example, if the defendants strongly maintained that the video impeached the plaintiff, the defendants could have moved for a continuance to allow the plaintiffs a reasonable time to examine and determine the veracity of the video. This would more properly and efficiently balance the needs of the defendants and the plaintiffs in their search for the truth.

Overall, rather than giving the lower courts guidance, the majority opinion creates confusion and impedes the gatekeeping function of the trial court. For these reasons, with all due respect to my colleagues, I dissent in part and, concur in part, and I would recall the writ as improvidently granted.

---

[8] See *Day v. Thompson*, 24-00802 c/w 24-00806, p.10 (La. --/--/--), --- So. 3d ----.